**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VICTOR OCEGUEDA NUNEZ, a.k.a.
Victor Ocequeda Nunez, a.k.a.
Victor Nunez,

          *Petitioner,*

      v.

ERIC H. HOLDER JR., Attorney
General,

          *Respondent.*

No. 06-70219

Agency No.
A096-380-472

ORDER AND
AMENDED
OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 19, 2007—San Francisco, California

Filed February 10, 2010
Amended February 17, 2010

Before: Stephen Reinhardt, Jay S. Bybee and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Bybee

2841

## COUNSEL

Cheryl Franke, San Mateo, California, for the petitioner.

Ronald E. LeFevre, Office of the District Counsel, Department of Homeland Security; Eric Warren Marsteller and Jocelyn Lopez Wright, Office of Immigration Litigation, Department of Justice, Washington, D.C., for the respondent.

## ORDER

The dissent is amended to replace the citation to *Wooten v. Superior Court* on 2409 of the slip opinion with the following: <*Wooten v. Superior Court*, 113 Cal. Rptr. 2d 195 (Cal. Ct. App. 2001) (setting aside an information charging two individuals for pimping and pandering where defendants hired women to perform sexual acts on each other and not customers);>

**OPINION**

REINHARDT, Circuit Judge:

I.

Once again we face the question of what is moral turpitude: a nebulous question that we are required to answer on the basis of judicially established categories of criminal conduct. Although that may not be a satisfactory basis for answering such a question, it is the role to which we are limited by precedent as a court of law. Furthermore, any answer based on other considerations would in all probability be unacceptable to one or another segment of society and could well divide residents of red states from residents of blue, the old from the young, neighbor from neighbor, and even males from females. There is simply no overall agreement on many issues of morality in contemporary society.

Morality is not a concept that courts can define by judicial decrees, and even less can it be defined by fiats issued by the Board of Immigration Appeals, to whose decisions the courts must give great deference. Yet, for the purpose of our immigration laws we are required to follow those determinations and to start by applying categories of offenses that the judiciary or the Board members appointed by the Attorney General have deemed morally turpitudinous in all of their applications. We call this the categorical approach. How sensible those decisions are and how close to rational concepts of morality they may come can be seen by considering one of the offenses involved in the case before us. While under our law numerous felonies are deemed not to be morally turpitudinous, all acts of petty theft automatically qualify for that label and the drastic legal consequences that may follow. As some in today's society might say, and with good reason, "Go figure."

## II.

Victor Ocegueda Nuñez appeals the Board of Immigration Appeals' (BIA) affirmance of an Immigration Judge's (IJ) decision ordering him removed to Mexico. The BIA determined that Ocegueda had been convicted of two crimes of moral turpitude and that he was thus statutorily ineligible for cancellation of removal under 8 U.S.C. § 1229b(b)(1)(B). Because we conclude that indecent exposure under § 314 of the California Penal Code is not categorically a crime of moral turpitude, we grant the petition and remand.

## III.   Factual and Procedural Background

Victor Ocegueda Nuñez ("Ocegueda"),[1] a native and citizen of Mexico, entered the United States without inspection in March 1993, at the age of 15. While in the United States, he met and married his wife, a U.S. citizen, with whom he has three U.S. citizen children. On June 30, 2003, the Department of Homeland Security began removal proceedings against him on the ground that he was present in the United States without having been lawfully admitted or paroled. He conceded removability, but applied for cancellation of removal pursuant to 8 U.S.C. § 1229b(b)(1), on the basis that his removal would result in exceptional and extremely unusual hardship to his wife and children.

On September 15, 2004, one day before the hearing on Ocegueda's application for cancellation was to be held, the government filed a motion to pretermit. It argued that Ocegueda was statutorily ineligible for cancellation because he had been convicted of two crimes of moral turpitude during the past ten years: petty theft in 1995 and indecent exposure in 2003. The government's only evidence of the petty

---

[1]Multiple spellings of the petitioner's name appear throughout the record. We use Victor Ocegueda Nuñez, or Ocegueda, because that is the spelling used by the petitioner himself.

theft conviction was an FBI Report indicating that Ocegueda had been arrested and charged with petty theft on May 25, 1995. The Report did not indicate the disposition of the charge. Although Ocegueda's counsel was aware of the indecent exposure conviction, the motion to pretermit was apparently the first she had heard of Ocegueda's 1995 arrest for petty theft. A single conviction for a crime involving moral turpitude is not a statutory bar to cancellation of removal if the maximum penalty does not exceed one year's imprisonment, and if the individual is sentenced to six months or less. *See* 8 U.S.C. § 1182(a)(2)(A)(ii). Two convictions, however, render an alien ineligible for cancellation. 8 U.S.C. § 1229b(b)(1)(C).

Immediately after the government filed its motion to pretermit, Ocegueda filed an emergency motion to continue the hearing. He argued that he needed time to establish: (1) that indecent exposure was not a crime involving moral turpitude, and (2) that he had not actually been convicted of the petty theft offense. The IJ denied the motion.

At the September 16 hearing, the IJ questioned Ocegueda about the petty theft charge. He admitted that he had been arrested after a store security guard accused him of stealing a pair of pants and that he had subsequently appeared in court and paid a $100 fine. The IJ concluded that this testimony sufficed to establish a prior conviction for petty theft. The IJ determined that both petty theft and indecent exposure are crimes of moral turpitude and that Ocegueda was statutorily ineligible for cancellation on the basis of the two convictions. The IJ then concluded the hearing, without hearing any of Ocegueda's evidence that his removal would result in exceptional and extremely unusual hardship to his U.S. citizen family.

Ocedgueda appealed to the BIA. He argued that indecent exposure was not a crime of moral turpitude, and that the IJ's denial of his motion for a continuance violated Due Process.

He did not contest the classification of petty theft as a crime of moral turpitude. The BIA affirmed the IJ, concluding that indecent exposure, the offense proscribed by California Penal Code § 314, was also such a crime. It did not address the Due Process issue or the petty theft conviction except to agree with the IJ that Ocegueda's two convictions for crimes of moral turpitude made him statutorily ineligible for cancellation.

On appeal, Ocegueda raises two challenges to the BIA's decision. First, he argues that indecent exposure is not categorically a crime of moral turpitude. Second, he argues that his Due Process rights were violated because he never had an opportunity to respond to the government's motion to pretermit. Because we agree that California Penal Code § 314 covers a broader range of offenses than the generic definition of crimes of moral turpitude, we hold that indecent exposure is not categorically such a crime. Accordingly, we need not reach the Due Process question.

## IV.   Jurisdiction and Standard of Review

Whether a crime involves moral turpitude is a question of law that we have jurisdiction to review pursuant to 8 U.S.C. § 1252(a)(2)(D). We review the BIA's interpretation of the statute of conviction de novo. *Marmolejo-Campos v. Holder*, 558 F.3d 903, 911 (9th Cir. 2009) (en banc). The BIA's conclusion that a particular crime does or does not involve moral turpitude is subject to different standards of review depending on whether the BIA issues or relies on a published decision in coming to its conclusion. If it does either, we accord *Chevron* deference. *Id.* If it does neither, we defer to its conclusion to the extent that it has the "power to persuade." *Id.* at 909 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## V.   Analysis

**[1]** To determine if a crime involves moral turpitude, we first apply the categorical approach. *Nicanor-Romero v.*

*Mukasey*, 523 F.3d 992, 999 (9th Cir. 2008), *overruled on other grounds by Marmolejo-Campos*, 558 F.3d at 908-09. This requires us to compare the elements of the crime to the generic definition of moral turpitude and "decide whether the conduct proscribed in the statute is broader than, and so does not categorically fall within, this generic definition." *Id.* (quoting *Huerta-Guevara v. Ashcroft*, 321 F.3d 883, 887 (9th Cir. 2003)). In making this determination, we must find "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition" of moral turpitude. *Id.* at 1004 (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)). This realistic probability can be established by showing that, in at least one other case, "the state courts in fact did apply the statute in the special (nongeneric) manner . . . ." *Id.* at 1004-05 (relying on one case to establish a realistic probability); *see also Matter of Silva-Trevino*, 24 I. & N. Dec. 687, 708 (2008) (same).[2]

---

[2]Relying on his dissent in a prior case, Judge Bybee challenges our conclusion that one case may establish a realistic probability. Dissent at 2869. The dissent would be more "generous" to the government and would impose a higher burden on the petitioner to show that the state in fact applies its law to conduct that falls outside the generic definition of moral turpitude. *Id.* We do not believe that such generosity is appropriate. *Duenas-Alvarez* has not fundamentally changed the categorical approach, which requires us to ask "whether the full range of conduct encompassed by the statute constitutes a crime of moral turpitude." *Cerezo v. Mukasey*, 512 F.3d 1163, 1166 (9th Cir. 2008) (internal quotation marks omitted). Although the dissent is correct that not all of the *Nicanor-Romero* opinion was joined by a majority of the panel, Dissent at 2869, the majority of the panel did agree that "[t]o suggest that a state law does not apply to conduct involving moral turpitude unless it is regularly applied to non-turpitudinous conduct would not only bring an end to the 'categorical' approach, but would also require an entirely unmanageable standard." *Nicanor-Romero*, 523 F.3d at 1005. Moreover, the majority specifically rejected Judge Bybee's admonition that "it is unwise to rely on a single unpublished decision." *Id.* at 1024 (Bybee, J., dissenting). To the extent that there may be any doubt whether these views constituted a part of the majority's holding, we adopt them here. Further, where a criminal statute, as interpreted by the courts, encompasses conduct that is not morally turpitudinous and has actually been applied to punish such conduct, it requires

If the crime does not qualify under the categorical approach, we apply the modified categorical approach and look to documents within the record of conviction to see whether the conviction in the particular case involved moral turpitude. However, because the only information before the IJ was the fact of conviction, Ocegueda's conviction of indecent exposure can qualify as a crime of moral turpitude on the record before us only if it so qualifies under the categorical approach.

### A. Elements of § 314

California's indecent exposure statute reads as follows:

> Every person who willfully and lewdly . . . [e]xposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby . . . is guilty of a misdemeanor.

Cal. Penal Code § 314(1).

**[2]** The BIA correctly identified the elements of § 314. The provision prohibits: (1) sexually motivated exposure of one's private parts; (2) in a public place or a place where others are present. With respect to the mens rea element, California courts require "proof beyond a reasonable doubt that the actor not only meant to expose himself, but intended by his conduct to direct public attention to his genitals for purposes of sexual arousal, gratification, or affront." *In re Smith*, 497 P.2d 807,

---

no "legal imagination," *Duenas-Alvarez*, 549 U.S. at 193, to conclude that there is a realistic probability that the state would once again so apply it. *Cf. Cerezo*, 512 F.3d at 1167 ("[W]here . . . the state statute plainly and specifically criminalizes conduct outside the contours of the federal definition, we do not engage in judicial prestidigitation by concluding that the statute 'creates a crime outside the generic definition of a listed crime.'") (quoting *Duenas-Alvarez*, 549 U.S. at 193).

810 (Cal. 1972); *see also People v. Archer*, 119 Cal. Rptr. 2d 783, 786 (Cal. Ct. App. 2002) (holding that "sexual" modifies "arousal," "gratification", *and* "affront").

## B.   Generic definition of "moral turpitude"

We have previously discussed at some length the inherent ambiguity of the phrase "moral turpitude" and the consistent failure of either the BIA or our own court to establish any coherent criteria for determining which crimes fall within that classification and which crimes do not.**³** *See, e.g., Marmolejo-Campos*, 558 F.3d at 909 (" '[M]oral turpitude' is perhaps the quintessential example of an ambiguous phrase."); *id.* at 921 (Berzon, J., dissenting) ("[T]he BIA's precedential case law regarding the meaning of the phrase 'crime involving moral turpitude' . . . is a mess of conflicting authority."); *Nicanor-Romero*, 523 F.3d at 997-99 (summarizing Ninth Circuit law on moral turpitude and recognizing that "[w]e have not relied on a consistent or easily applied set of criteria" to identify crimes of moral turpitude). Our definition tells us only that crimes of moral turpitude are crimes that involve either fraud or "base, vile, and depraved" conduct that "shock[s] the public conscience." *Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1074-75 (9th Cir. 2007) (en banc) (Reinhardt, J., concurring for the majority) (internal quotation marks removed).

[3] Absent consistent or logical rules to follow as we determine whether a crime (other than one involving fraud) involves moral turpitude, our most useful guidance often comes from comparing the crime with others that we have previously deemed morally turpitudinous. *See Navarro-Lopez*, 503 F.3d at 1075 (Reinhardt, J, concurring for the majority) ("Under our current test for moral turpitude, we

---

**³**We have held that, at this stage of our analysis, we "rel[y] on our own generalized definition" of the term moral turpitude because the BIA has failed to provide any generic definition to which we could meaningfully defer. *Marmolejo-Campos v. Holder*, 558 F.3d at 910.

compare a crime's depravity with that of crimes we have previously determined to be base, vile, and depraved . . . ."). A review of BIA and Ninth Circuit precedent reveals that non-fraudulent crimes of moral turpitude almost always involve an intent to harm someone, the actual infliction of harm upon someone, or an action that affects a protected class of victim.[4]

---

[4]We do not suggest that *every* crime that has been held by us to involve moral turpitude falls within this grouping. There are a number of exceptions or outliers. *See, e.g.*, *Marmolejo-Campos v. Holder,* 558 F.3d 903 (9th Cir. 2009) (en banc) (deferring to the BIA's conclusion that driving under the influence without a license is a crime of moral turpitude). The difficulty of discerning any logical justification for these exceptions is one of the reasons we have repeatedly concluded that our own and the BIA's case law on moral turpitude is inconsistent and incoherent. See, e.g., *id.* at 910 (stating that the BIA has "fail[ed] to particularize the term [moral turpitude] in any meaningful way") (internal quotation marks removed); *Nicanor-Romero*, 523 F.3d at 997-99 (recognizing that "[w]e have not relied on a consistent or easily applied set of criteria" to identify crimes of moral turpitude). Our characterization does not seek to encompass every single crime that has been held to involve moral turpitude (largely because we do not think there is any meaningful characterization that can do so). Rather, we intend to identify only the general grouping into which the vast majority of crimes of moral turpitude fall.

The intent to harm is usually key to satisfying what the BIA has said is the defining characteristic of a crime of moral turpitude: "evil intent." *Matter of Flores*, 17 I. & N. Dec. 225, 277 (BIA 1980) ("[E]vil or malicious intent is . . . the essence of moral turpitude."); *but see Matter of Medina*, 15 I. & N. Dec. 611, 614 (BIA 1976) ("[The] presence or absence of a corrupt or vicious mind is not controlling" in deciding whether a crime involves moral turpitude.). The intentional or reckless commission of an act that causes harm to someone—even where the harm was not specifically intended—can also satisfy this "evil intent" requirement. *See Matter of Franklin,* 20 I. & N. Dec. 867 (BIA 1994) (holding that involuntary manslaughter is a crime of moral turpitude). And, where a protected class of victim is involved, such as children or individuals who stand in a close relationship to the perpetrator, both the BIA and this court have been flexible about the intent "requirement," extending the category of crimes of moral turpitude to encompass even unintentional acts that only threaten harm. *See, e.g., Morales v. Gonzales*, 478 F.3d 972, 978 (9th Cir. 2007) (holding that "communication with a minor for immoral purposes" is a crime of moral turpitude).

*See, e.g., In re Lopez-Meza*, 22 I. & N. Dec. 1188, 1193 (BIA 1999) (identifying "murder, rape, robbery, kidna[p]ping, voluntary manslaughter, some involuntary manslaughter offenses, aggravated assaults, mayhem, theft offenses, spousal abuse, child abuse, and incest" as crimes of moral turpitude); *Morales-Garcia v. Holder*, 567 F.3d 1058, 1065-66 (9th Cir. 2009) (explaining that assault is not generally a crime of moral turpitude unless it involves either intentional infliction of serious harm or infliction of harm on a protected class of victim); *Marmolejo-Campos v. Gonzales*, 503 F.3d 922, 927 (9th Cir. 2007) (D.W. Nelson, J., dissenting), *reheard in banc*, 558 F.3d 903 (9th Cir. 2009) (citing cases in which the BIA and Ninth Circuit determined that burglary, assault and battery, malicious mischief, alien smuggling, assault with a deadly weapon, indecency, rioting, and money laundering are not crimes of moral turpitude).

This is no less true when it comes to sexual offenses. We have held that the following sex-related crimes are categorically crimes of moral turpitude: "lewd and lascivious conduct toward a child," *Schoeps v. Carmichael*, 177 F.2d 391, 394 (9th Cir. 1949); incest, *Gonzalez-Alvarado v. INS*, 39 F.3d 245, 246 (9th Cir. 1994); knowing possession of child pornography, *United States v. Santacruz*, 563 F.3d 894, 897 (9th Cir. 2009); and communication with a minor for immoral purposes, *Morales v. Gonzales*, 478 F.3d 972, 978 (9th Cir. 2007). We have also recognized that rape is categorically a crime of moral turpitude. *Navarro-Lopez*, 503 F.3d at 1075 (Reinhardt, J, concurring for the majority). These crimes universally involve either actual infliction of harm or a protected class of victim; most often a combination of the two. In fact, never without the presence of at least one of these factors have we deemed a sexual offense to involve moral turpitude.

If we search far enough back into the case law of the BIA and other circuits, it is true that we find decisions holding that conduct that is "shock[ing]," not by virtue of its impact upon victims, but by virtue of its incompatibility with contempo-

rary sexual attitudes is, on that basis alone, "morally turpitudinous." At various times, the BIA and the courts have labeled as morally turpitudinous such offenses as consensual oral sex, *Matter of Leyva*, 16 I. & N. Dec. 118 (BIA 1977), consensual anal sodomy, *Velez-Lozano v. INS*, 463 F.2d 1305 (D.C. Cir. 1972), and "overt and public homosexual activity" *Matter of Alfonzo-Bermudez*, 12 I. & N. Dec. 225 (BIA 1967). These cases remind us that private, consensual homosexual conduct, which the Supreme Court held to be constitutionally protected in *Lawrence v. Texas*, 539 U.S. 558 (2003), was not so long ago deemed "base and depraved" and a crime of moral turpitude in some courts. *See, e.g.*, *Williams v. State*, 316 So. 2d 362, 363-64 (Ala. 1975) ("[W]e have no hesitancy whatever in arriving at the conclusion that a crime that consists of sexual relations between persons of the same sex . . . involves moral turpitude. . . . The practice of sodomy is inherently inimical to the general integrity of the human person, and [i]s clearly an offense involving moral turpitude . . . .") (internal quotation marks omitted).

Since these older cases were decided, the fluid boundaries of our nebulous "moral turpitude" standard have moved away from the rigid imposition of austere moral values on society as a whole and substantially in the direction of affording tolerance and individual liberty to those whose moral attitudes differ from the contemporary majority's. Today, consensual sexual conduct among adults may not be deemed "base, vile, and depraved" as a matter of law simply because a majority of people happen to disapprove of a particular practice. Indeed, as with all crimes, if the conduct at issue were not offensive to at least a majority, there would be no reason to prohibit it and thus render it a criminal act. More is required for moral turpitude. *See Navarro-Lopez*, 503 F.3d at 1071 (holding that a definition of moral turpitude that encompassed *all* criminal conduct would be overbroad and contrary to the intent of Congress).

## C.   § 314 and the Generic Definition of Moral Turpitude

We now turn to the question whether all of the conduct proscribed by § 314 falls within our generic definition of moral turpitude. The BIA concluded that indecent exposure under § 314 is categorically a crime of moral turpitude, which means that it must have found the answer to our question to be, yes. The BIA reached this conclusion in an unpublished opinion that does not rely on prior precedential decisions.[5] Therefore, we will defer to its determination only to the extent that it has the "power to persuade." Here, we can dispose of that question quickly. As the Supreme Court stated in *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944), deference should be given according to the "thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *See also Marmolejo-Campos*, 558 F.3d at 909. The BIA's one-paragraph analysis rests entirely on the ipse dixit statement that because § 314 requires a sexual motivation, it is a crime of moral turpitude. We do not find the BIA's cursory, conclusory analysis in any way persuasive and therefore do not defer to its conclusion with respect to the morally turpitudinous nature of § 314.

California's indecent exposure statute criminalizes a range of conduct that offends the sensibilities of many, and perhaps most, people. We conclude that it does not, however, *categorically* meet the federal standard for moral turpitude. Some of the behavior that may be punished under the California statute

---

[5]The BIA's decision cites one precedential case, *Matter of Mueller*, but only for the purpose of rejecting petitioner's argument that *Mueller* required it to conclude that indecent exposure was not a crime of moral turpitude. 11 I. & N. Dec. 268 (BIA 1965). The BIA found that *Mueller* was distinguishable because the statute it examined did not require a sexual motivation. The BIA did not rely on *Mueller* to determine that § 314 is a crime of moral turpitude, but rather determined only that *Mueller* did not control.

would certainly qualify as morally turpitudinous, but that is not the question before us. Here we must determine whether the full range of conduct prohibited by the statute falls within the definition of that term. The answer to that question is no.

**[4]** We start by recognizing one point that does not appear to be in dispute. Exposing oneself in a public place is not *necessarily* either "lewd" (as required by § 314) or "base, vile and depraved" (as required by our traditional definition of moral turpitude). For example, as the BIA and the California courts appear to agree, a sunbather who removes all his clothes to tan on an unoccupied public beach and wakes to find himself surrounded by offended beachgoers has done nothing either lewd or depraved and thus is neither in violation of § 314 nor guilty of a morally turpitudinous act. *See Smith*, 497 P.2d at 810. Similarly, the California courts have indicated that they would not uphold a § 314 conviction for urinating in public, because exposure motivated by the need to relieve oneself is not properly classified as "lewd." *Id.* at 810 n.4. Under § 314, it is the sexual intent with which the exposure occurs that transforms it into an act that is criminal, rather than an act that is merely improper or inappropriate. Thus, the question we must next answer is whether, by limiting § 314 to "sexually motivated" exposure, California courts have limited it to conduct all of which can properly be described as morally turpitudinous.[6] For the reasons we now discuss, the answer once more is no.

**[5]** In a number of important respects, California courts have construed "sexual motivation" quite broadly. As one would expect, exposure is "sexually motivated" if it is done with the intent to sexually gratify the actor. However, "the statute . . . also reaches the specific intent to create sexual arousal *in those persons observing the defendant*." *People v.*

---

[6]To answer this question, we do not consider, as the dissent suggests, Dissent at 2866-67, whether the conduct is "lewd," but rather whether it is "base, vile, and depraved." *See supra* at 2851-55.

*Conway*, 162 Cal. Rptr. 877, 879 (Cal. App. Dep't Super. Ct. 1979) (emphasis added), *partially disapproved of by Morris v. Municipal Court*, 652 P.2d 51, 58 n.13 (Cal. 1982); *see also People v. Earle*, 91 Cal. Rptr. 3d 261, 277 (Cal. Ct. App. 2009). Additionally, the statute is satisfied if a person acts for the purposes of "sexual affront," which involves neither sexual gratification of the actor *nor* the viewer, but rather an intent on the part of the actor to "insult" or "offend" in a sexual way. *See Archer*, 119 Cal. Rptr. 2d at 786-87. Finally, the statute's requirement that there be "present other persons to be offended or annoyed thereby" is fulfilled when the exposure occurs in the presence of individuals who might in theory be offended by the conduct, even if, in actuality, they are not:

> It is not the burden of the prosecution to prove that the observer was in fact offended by the conduct but only that the conduct was such that defendant should know that the observer "may be offended." Although the distinction is a subtle one, it is significant. The thrust of this inquiry is the state of mind of defendant —whether he should know that his conduct may offend another. Whether the observer thereafter is offended thus has minimal evidentiary bearing upon defendant's preceding state of mind.

*People v. Rylaarsdam*, 181 Cal. Rptr. 723, 728 (Cal. App. Dep't Super. Ct. 1982).[7]

---

[7]The facts of *People v. Rylaarsdam* are illustrative of the problems inherent in judging whether particular sexual conduct is so offensive and shocking as to involve "moral turpitude." That case upheld a conviction under § 314 for an incident that took place in a motion picture booth at an adult bookstore where gay pornography was being shown. 181 Cal. Rptr. at 725-27. The bookstore was a "cruising place" where gay men often went to meet other gay men. The defendant stuck his finger into a hole between his booth and an adjacent booth — commonly known as a "glory hole" — in which an undercover police officer "happened to be sitting." This "overture" was not received negatively, and the two men made eye contact through the hole. The defendant interpreted the response as a

**[6]** The statute thus encompasses three quite different types of "sexually motivated" exposure. A person may be convicted under § 314 for exposing himself for the purposes of his own sexual gratification, for the purpose of sexual gratification of the viewer, or for the purpose of offending the viewer in a sexual way. As the California Court of Appeal recently confirmed:

> [W]hile insult is a common feature of the paradigmatic indecent exposure [under § 314], it is not a necessary element of the crime. A purpose of affronting the victim *may* satisfy part of the mens rea, but it is not necessary; the crime is also complete if the defendant acts for purposes of his own or the victim's (presumably imagined) arousal or gratification, whether or not he intends to cause affront or believes he is doing so.

*Earle*, 91 Cal. Rptr. 3d at 277 (analyzing mental elements of § 314) (internal quotation marks removed); *see also* Cal. Jury Instr. 16.220 (2009) (stating that, to prove violation of § 314, government must show that the defendant exposed him or herself "with the specific intent to direct public attention to [his][her] genitals for the purpose of [his][her] own sexual arousal or gratification, or that of another or of sexually insulting or offending others").

### 1. Exposure for sexual gratification

**[7]** With respect to both mens rea and actus reus, § 314 in its first two manifestations—exposure with the intent to sexu-

---

receptiveness to further sexual advances. He then inserted his penis through the hole into the adjacent booth, a function that the hole was designed to serve. *Id.* We need not rely on this case in making our determination, however, because, as we discuss *infra*, § 314 reaches other conduct that even more obviously fails to qualify as morally turpitudinous.

ally gratify oneself or the viewer— is quite similar to the crime of "annoy[ing] . . . a[ ] child," (defined as engaging in objectively irritating conduct toward an underage victim when motivated by an abnormal sexual interest in victim), which we recently held not to be categorically a crime of moral turpitude. *Nicanor-Romero*, 523 F.3d at 1000. Neither offense requires that the "victim" actually be harmed or even bothered by the offender's conduct. *Id.* Nor does either require that the offender *intend* any harm; rather, in both cases, the statutory elements may be satisfied as long as the offender's motivation was "sexual" and he *should have known* that his conduct may be offensive (in the case of indecent exposure) or irritating (in the case of annoying a child). We held that the crime of "annoy[ing] . . . a[ ] child" is not a crime of moral turpitude, even though that crime does share one characteristic with other crimes we have found morally turpitudinous: a protected class of victim. *Nicanor-Romero*, 523 F.3d at 1002-03. Indecent exposure, in contrast, as interpreted by the California courts, does not categorically have anything in common with the type of crime we have normally held to involve moral turpitude. It can be committed without any intention of harming anyone, it need not result in actual harm, and it does not necessarily involve a protected class of victim. Thus, under *Nicanor-Romero*, § 314 would appear not to prohibit only conduct that is morally turpitudinous and thus does not categorically constitute a crime of moral turpitude. Indeed, as we now explain, "[California] courts in fact [have] appl[ied]" the statute to reach non-morally turpitudinous conduct. *Duenas-Alvarez,* 549 U.S. at 193.

**[8]** Because there is no requirement that the viewers *actually* be offended by the exposure, and because the purpose of the conduct may be the "sexual arousal or gratification" of the *viewer*, rather than the exposer, California courts have, under § 314, upheld convictions for nude dancing at bars. For example, in *People v. Conway*, the

> defendant was a waitress and dancer in a beer bar. While she was clothed when serving beer, she was

observed to undress and perform naked on a raised platform located along one wall of the barroom. She openly displayed her private parts to the nearby customers, paying most of her attention to those customers who placed money on the platform for defendant.

*Conway,* 162 Cal. Rptr. at 878.[8] *See also People ex rel. Hicks*

---

[8]*Conway* remains good law in relevant part, despite the California Supreme Court's subsequent disapproval of some of its language. *See Morris,* 652 P.2d at 58 n.13. Although *Morris* excludes conduct protected by the First Amendment from § 314's reach, there is nothing in *Morris* to suggest that a conviction for nude dancing in a bar would violate the First Amendment. *Morris* held only that "[a]n enactment prohibiting nonobscene nude dancing which extends beyond establishments serving alcohol is presumptively overbroad." *Id.* at 57-58 (emphasis added). Under *Morris,* restrictions on nude dancing in establishments serving alcohol do not violate the First Amendment.

The dissent argues at length that *Conway* is "weak[ ] precedent" because "the law relating to nude dancing has changed dramatically since *Conway* was decided." Dissent at 2875-78. But the change in law to which the dissent refers has significantly strengthened *Conway's* conclusion that § 314's application to nude dancing does not violate the First Amendment. In the years since *Conway* was decided, the Supreme Court has on two occasions upheld public nudity ordinances against First Amendment challenges, even though the ordinances had the effect of completely banning "totally nude erotic dancing performed by women" and requiring that, "[erotic] dancers must wear, at a minimum, 'pasties' and a 'G-string.' " *City of Erie v. Pap's A.M.,* 529 U.S. 277, 283-84 (2000) (plurality); *see also Barns v. Glen Theatre, Inc.,* 501 U.S. 560 (1991) (plurality). As the California courts have recognized, *Barns* and *Erie* establish that nude dancing receives *less* First Amendment protection than *Morris* had assumed. *See Krotz v. San Diego,* 39 Cal. Rptr. 3d 535, 545 (Cal. Ct. App. 2006) ("Had *Morris* been decided today, we have no doubt that it would have recognized the limits on the First Amendment protection extended by the United States Supreme Court [in *Barnes* and *Erie*]."); *Tiley B., Inc. v. City of Newport Beach,* 81 Cal. Rptr. 2d 6, 16-18 (Cal. Ct. App. 1998) (rejecting First Amendment challenge to ordinance banning public nudity, including nude dancing, and stating that *Morris's* expansive interpretation of First Amendment protection for nude dancing had been "foreclosed by *Barnes*"). Thus, the developments in First Amendment law referred to by the dissent have neither weakened *Conway* nor called into question *Morris's* conclusion that nude dancing in bars may be banned without offending the Constitution. *See also* note 9, *infra,* at p. 2862.

*v. Sarong Gals*, 103 Cal. Rptr. 414, 415 (Cal. Ct. App. 1972) (noting multiple arrests of dancers at a topless-bottomless bar for violating § 314).

**[9]** Erotic, completely nude dancing is offensive to many people. It is not, however, so "base, vile, and depraved" that it shocks the conscience. As a plurality of the Supreme Court explained, "nude dancing . . . is expressive conduct, although . . . it falls only within the outer ambit of the First Amendment's protection." *City of Erie*, 529 U.S. at 289. It would be odd indeed to hold that conduct that is entitled to some protection in order to keep our society free is also flatly "contrary to the societal duties we owe each other."**⁹** *Navarro-Lopez*, 503 F.3d at 1069. Nude dancing, moreover, is a prototypical victimless crime. Whatever one's view of the merits of such conduct, it is simply not base, vile, and depraved. As with the conduct at issue in *Rylaarsdam*, *see* p. 2858-59, *supra,* it may shock certain individuals but not those who patronize the establishment in order to see or take part in it. It does not cause them physical or psychological harm and it certainly does not shock their conscience.

### 2. Exposure for sexual affront

The application of the statute to nude dancing is sufficient to resolve this case in Ocegueda's favor. Despite the ambiguity of the term "moral turpitude," it is as clear as can be that nude dancing lies outside its boundaries. However, in case any doubt remains, we need consider only that in its third manifestation—exposure with the intent to sexually *offend* the

---

**⁹**The Supreme Court has not been clear about the exact level of protection to which nude dancing is entitled. For our analysis here, it is relevant only that nude dancing is expressive conduct protected to some extent by the First Amendment and that an ordinance prohibiting public nudity that has the effect of banning nude dancing may nonetheless be constitutional, although a full majority of the Court has yet to agree on the *reason* for the latter proposition. *See City of Erie*, 529 U.S. at 302; *see also supra*, note 8.

viewer—§ 314 encompasses conduct that cannot under any reasonable definition of the term be classified as "moral turpitude."

Both our court and the BIA have repeatedly held that simple assault and battery are not categorically crimes of moral turpitude. *See Morales-Garcia,* 567 F.3d at 1065. This is, in part, because they encompass "de minimus conduct or harm, such as offensive or provocative physical contact or insults, which is not ordinarily considered to be inherently vile, depraved, or morally reprehensible." *In re Solon*, 24 I. & N. Dec. 239, 241 (2007); *see also Fernandez-Ruiz v. Gonzales,* 468 F.3d 1159, 1168-69 (9th Cir. 2006) (holding that the crime of "knowingly touching another person with the intent to injure, insult, or provoke" does not involve moral turpitude). Similarly, in another context—addressing the crime of property damage, rather than assault—we held that Washington's "malicious mischief" offense was not categorically a crime of moral turpitude because it encompassed the destruction of "as little as $250.00 of another's property with an evil wish to annoy" and thus "extends to include pranksters with poor judgment." *Rodriguez-Herrera v. INS*, 52 F.3d 238, 240 (9th Cir. 1995).

**[10]** Section 314, as interpreted by the California courts, also encompasses "offensive or provocative . . . insults," *Solon,* 24 I. & N. Dec. at 241, as well as the conduct of "pranksters with poor judgment." *Rodriguez-Herrera,* 52 F.3d at 240. Two examples suffice to illustrate the point. In one recent case, the California Court of Appeal upheld the conviction under § 314 of a defendant who, in a fit of "road rage," exposed his penis and yelled "suck [my] dick" at an adjacent driver. *Archer*, 119 Cal. Rptr. 2d at 786-87. In the second case, the court upheld the conviction of a 12-year-old boy who pulled down his pants during class and showed his penis to two female classmates. *People v. Lionel M.*, No. H031030, 2007 WL 2924052 (Cal. Ct. App. Oct. 9, 2007) (unpublished).[10]

---

[10]The dissent's argument that it is inappropriate to rely on an unpublished opinion to establish a realistic probability that a statute will be

On both occasions, the court found that § 314's mental state requirement was satisfied because the defendant had acted with the purpose of "sexually insulting or offending" the viewer.[11] The former defendant's conduct was surely crass and the latter's was just as obviously inappropriate. However, neither act could rationally be characterized as inherently base, vile and depraved.[12] Compared to the other crimes we have

applied to conduct that falls outside the generic definition of moral turpitude, Dissent at 2882 n.4, is foreclosed by precedent. *See Castillo-Cruz v. Holder*, 581 F.3d 1154, 1161 n.9 (9th Cir. 2009) (explaining that unpublished opinions are pertinent to show how a statute has been applied in practice); *Vizcarra-Ayala v. Mukasey*, 514 F.3d 870, 876 n. 3 (9th Cir. 2008) (same). It is also illogical. Our concern is with whether individuals have been convicted under § 314 for non-morally turpitudinous conduct. A conviction is no less real because it was upheld in an unpublished, rather than a published opinion. Indeed, the majority of people who are convicted under § 314 almost certainly never go to trial at all, but rather plead guilty to the charge. Contrary to the dissent's contention, a lack of published cases or appellate-level cases does not imply a lack of convictions.

[11]These cases may at first appear difficult to reconcile with the Court of Appeal's earlier decision in *People v. Dallas W*, which reversed a 16-year-old boy's § 314 conviction for mooning oncoming traffic because there was no evidence that the boy had acted with sexual intent. 102 Cal. Rptr. 2d 493 (Cal. Ct. App. 2000). However, the cases can be harmonized on the basis that mooning is widely recognized as "a defiant or amusing gesture" that is not related to sex, while exposing one's penis necessarily has a sexual connotation. *Dallas*, 102 Cal. Rptr. 2d at 493 n.1. Indeed, the trial court in *Dallas* had found that the defendant had acted with the intent to cause generic affront only. *Id.* The Court of Appeal concluded that an intent to cause *non*-sexual affront was insufficient to support the defendant's § 314 conviction.

[12]The dissent accuses us of waging a "collateral attack" on the California courts' decisions in *Archer* and *Lionel*. Dissent at 2867, 2883. To the contrary, we fully credit the California courts' descriptions of the facts of those cases. We also accept the courts' carefully reasoned conclusions that the conduct at issue in each case constituted a violation of § 314. In fact, it is precisely because we accept the state courts' determinations that the facts, as described in the state courts' opinions, support convictions under § 314 that we conclude that § 314 covers a broader range of offenses than

deemed to involve moral turpitude, the defendants' actions were relatively harmless. *See supra* Part V.B. The only difference between their acts and the provocative insults and tasteless pranks that we have previously held to be non-morally turpitudinous is the element of sexuality involved. But our society is past the point where transitory nudity or a brief reference to sex necessarily transforms an otherwise de minimus provocation into a morally turpitudinous offense. There are obviously circumstances under which unwanted, sexually motivated exposure would be highly threatening, intrusive, and psychologically damaging to viewers. However, as our two examples make clear, § 314 reaches far beyond such harmful conduct to encompass mere acts of provocation, bad taste, and failed humor. Although inappropriate and offensive, these acts are not "base, vile, and depraved," nor do they shock the conscience.

\*\*\*

**[11]** Because nude dancers and partially exposed purveyors of "sexual" insults have been convicted under § 314, there is "a realistic probability, not a theoretical possibility, that the State would apply [the indecent exposure] statute to conduct that falls outside the generic definition of [moral turpitude]." *Duenas-Alvarez* 549 U.S. at 193 (2007). Here the "state courts in fact did apply the statute in the special (nongeneric) manner for which [Ocegueda] argues." *Id.* Indecent exposure is therefore not, categorically, a crime of moral turpitude. California's statute, as interpreted by state court judges, has not been limited to conduct that can objectively be held to meet our standardless standard that governs moral turpitude.

---

those that are morally turpitudinous. There is no need for us to conduct any independent investigation into the record, as the dissent suggests. Dissent at 2867. We evaluate the cases on the basis of the written opinions, as we have always done in applying the categorical approach. *See, e.g., Castillo-Cruz*, 581 F.3d at 1161. To do otherwise would render the application of *Duenas-Alvarez* wholly impractical.

## VI.

**[12]** Because indecent exposure as defined by Cal. Penal Code § 314, and as construed by California courts, is not categorically a crime involving moral turpitude, the BIA erred in determining on the record before it that Ocegueda was statutorily ineligible for cancellation of removal. We therefore GRANT the petition and REMAND for further proceedings consistent with this opinion.

PETITION GRANTED AND REMANDED.

BYBEE, Circuit Judge, dissenting:

California punishes persons who "willfully and lewdly . . . expose [their] private parts" in a public place or in a place where there are unwilling persons. CAL. PENAL CODE § 314(1). The California Supreme Court has read § 314 to reach only one who "intentionally direct[s] attention to his genitals for sexual purposes." *In re Smith*, 497 P.2d 807, 810 (Cal. 1972). In *Gonzales v. Duenas-Alvarez*, the Supreme Court told us that to find that California's indecent exposure statute is a crime outside the generic definition of a crime involving moral turpitude "requires more than the application of legal imagination to a state statute's language." Indeed, "[i]t requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of [the] crime." 549 U.S. 183, 193 (2007). But "legal imagination" and "theoretical possibilities" are the warp and woof of the majority's decision.

Despite the clarity of California's indecent exposure statute, punishing persons who "wilfully and lewdly . . . expose [their] private parts," the majority holds that Ocegueda's conviction is not a crime involving moral turpitude. Maj. Op. at 2847. The majority does not expressly argue that such lewd

conduct is not a crime involving moral turpitude. Instead, the majority points to three convictions that, in its opinion, did not involve lewd conduct. First, the majority claims that California has "upheld convictions for nude dancing at bars." Maj. Op. at 2860. No it hasn't, at least not in any way that counts under *Duenas-Alvarez*. The one nude dancing case the majority cites, *People v. Conway*, 162 Cal. Rptr. 877 (Cal. App. Dep't Super. Ct. 1979), was expressly disapproved by the California Supreme Court in 1982, *Morris v. Municipal Court*, 652 P.2d 51, 58 n.13 (1982), and the case has not been cited since. And, I am quite confident that there is nude dancing going on in California bars even as I write this, and no one is being arrested under § 314. So much for a "realistic probability." Second, the majority discovered two other cases that it thinks demonstrate § 314's overbreadth. One involved indecent exposure during a "road rage" incident, *People v. Archer*, 119 Cal. Rptr. 2d 783 (Cal. Ct. App. 2002), and the other (an unpublished decision) involved indecent exposure to twelve year-old girls at school, *People v. Lionel M.*, 2007 WL 2924052 (Cal. Ct. App. Oct. 9, 2007). Without any record on which to base its judgment, the majority dismisses conduct the California courts found to be lewd as "relatively harmless" and merely "provocative insults and tasteless pranks." Maj. Op. at 2865. The majority's collateral attack on these convictions is wholly inappropriate in this context and, at best, revisionist history.

Whatever Ocegueda did to get himself convicted of indecent exposure, we can be fairly confident that it involved more than being a nude dancer at a bar or a "tasteless prank." Because I believe that Ocegueda's conviction for indecent exposure under § 314 is categorically a crime involving moral turpitude, I would uphold the decision of the Board of Immigration Appeals and deny the petition. I respectfully dissent.

I

Section 1229b(b)(1) of Title 8 gives the Attorney General discretionary authority to cancel the removal of an alien who

is inadmissible to or deportable from the United States. To qualify for cancellation of removal under this section, an alien must establish, among other requirements, that he or she (1) "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of [the alien's application for cancellation of removal]," and (2) "has been a person of good moral character during such period." 8 U.S.C. § 1229b(b)(1)(A)-(B). Section 1101(f)(3) provides that an alien cannot establish good moral character if the alien has been convicted of a crime listed in 8 U.S.C. § 1182(a)(2)(A)-(B), which includes a "crime involving moral turpitude." 8 U.S.C. § 1182(a)(2)(A)(i)(I).

In this case, the only evidence tendered by the government is the fact Ocegueda was convicted of violating § 314, California's indecent exposure statute. Thus, absent additional documentation, Ocegueda's conviction only qualifies under 8 U.S.C. § 1182(a)(2)(A)(i)(I) if § 314 categorically describes conduct involving moral turpitude.

The Supreme Court has placed a critical limit on the scope of our inquiry under the categorical approach. In *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007), the Court explained, "to find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal imagination to a state statute's language." *Id.* at 193. Rather, "[i]t requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." *Id.* The Court continued, "[t]o show that realistic probability, an offender . . . must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues." *Id.*

We have held that "the Supreme Court squarely placed the burden on the alien to demonstrate a realistic probability that the state would apply the offense in a way that falls outside

the generic definition of the crime." *Ortiz-Magana v. Mukasey*, 542 F.3d 653, 660 (9th Cir. 2008). Ordinarily, we begin by asking whether the "state statute plainly and specifically criminalizes conduct outside the contours of the federal definition." *Cerezo v. Mukasey*, 512 F.3d 1163, 1167 (9th Cir. 2008). If we think the statute is too broad, we will "still consider whether California courts have interpreted the [statute] more narrowly so as to make it applicable only to conduct which involves moral turpitude." *Id.* at 1167-68. Although it seems less likely, we may also entertain an argument the state courts have expanded what the statute "plainly and specifically criminalizes."

The import of *Duenas-Alvarez* in this case is clear. We may not apply our "legal imagination," but must find a "realistic probability" that California is enforcing its indecent exposure law outside a generic definition of "moral turpitude." Proof of such a "realistic probability" requires "cases" in which California courts "in fact" applied the statute in a nongeneric fashion. The majority claims that "[t]his realistic probability can be established by showing that, in at least one other case, 'the state courts in fact did apply the statute in the special (nongeneric) manner . . . .' " Maj. Op. at 2850 (quoting *Nicanor-Romero v. Mukasey*, 523 F.3d 992, 1004-05 (9th Cir. 2008)). I question whether just any single case will satisfy *Duenas-Alvarez*. The case the majority cites for the proposition, *Nicanor-Romero*, relied on a single, unpublished decision for evidence of the "realistic probability." That portion of the opinion, however, was the opinion of a single judge and thus is not the judgment of the court. *See Nicanor-Romero*, 523 F.3d at 1005-07 (opinion of W. Fletcher, J.); *id.* at 1011 (Pregerson, J., specially concurring); *id.* at 1022-24 & n.11 (Bybee, J., dissenting).

Moreover, for reasons I explained in my dissent in *Nicanor-Romero*, I think that to satisfy *Duenas-Alvarez* we need something more than scouring state records to see if we can find a conviction that we think falls outside some generic

ideal. As I wrote in *Nicanor-Romero*, "I do not believe that the Supreme Court in *Duenas-Alvarez* meant for us to take the least generous approach possible in analyzing state cases under the categorical approach . . . ." 523 F.3d at 1023 (Bybee, J., dissenting). As judges, we are, or should be, well aware of our own mortality. Just as our occasional, uncorrected errors do not represent the body of the law of the United States, we should hesitate before taking a single, possibly aberrant state case and elevating it to state law. A considered case from the state's highest court or appellate court would be strong evidence of the meaning of the statute. A single decision of a lower state court—particularly when the decision is dated or the opinion is not carefully considered—does not, in my view, satisfy the petitioner's duty to show the "realistic probability." As the Supreme Court told us, "To show that realistic possibility, an offender, of course, may show that the statute was so applied in his own case. But he must at least point to his own or other *cases* in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues." *Duenas-Alvarez*. 549 U.S. at 193 (emphasis added).

## II

As Ocegueda declined to come forward with any evidence that California applied the indecent exposure statute to *him* in a "special (nongeneric) manner," we are left to consider how California construes and applies § 314 in the main. With *Duenas-Alvarez* in mind, I address first the generic standards for a crime of moral turpitude. I then address standards for obtaining a conviction under § 314 and discuss how California courts have applied those standards *in fact.* Lastly, I address the cases the majority uses to show that California applies § 314 to conduct outside the generic definition of a crime involving moral turpitude.

## A

We have "consistently defined 'moral turpitude' as involving conduct that is inherently base, vile, or depraved, and con-

trary to the private and social duties man owes to his fellow men or to society in general." *Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1068 (9th Cir. 2007) (en banc). This definition is "employed by the BIA" and is "relatively consistent throughout the federal courts." *Id.*

In general, we have "divided crimes involving moral turpitude into two basic types: 'those involving fraud and those involving grave acts of baseness or depravity.'" *Galeana-Mendoza v. Gonzales*, 465 F.3d 1054, 1058 (9th Cir. 2006) (quoting *Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005)); *see also In re Ajami*, 22 I. & N. Dec. 949, 950 (BIA 1999); *Matter of Short*, 20 I. & N. Dec. 136, 139 (BIA 1989). In non-fraud cases, we have looked to "accepted moral standards" for guidance in determining the types of behavior that involve moral turpitude. *See Rodriguez-Herrera v. INS*, 52 F.3d 238, 240 (9th Cir. 1995).

The federal courts have long held that sexual offenses violate "accepted moral standards" and come within the category of "grave acts of baseness or depravity." These offenses include indecent assault, *Maghsoudi v. INS*, 181 F.3d 8, 10-11 (1st Cir. 1999); lewd and lascivious conduct, *Schoeps v. Carmichael*, 177 F.2d 391, 394 (9th Cir. 1949); statutory rape, *Castle v. INS*, 541 F.2d 1064, 1066 (4th Cir. 1976); *Marciano v. INS*, 450 F.2d 1022, 1024 (8th Cir. 1971); *incest, Morales v. Gonzales*, 478 F.3d 972, 978 (9th Cir. 2007); and contributing to the sexual delinquency of a minor, *Sheikh v. Gonzales*, 427 F.3d 1077, 1082 (8th Cir. 2005); *Palmer v. INS*, 4 F.3d 482, 485 (7th Cir. 1993). Unlike other types of crimes falling into the category of grave and base acts, sexual offenses have generally been classified as crimes involving moral turpitude irrespective of any injury to the victim, physical or otherwise. Sexual misconduct also need not involve physical assault to violate contemporary moral standards; even fully consensual conduct can involve moral turpitude. *See, e.g.*, *Franklin v. INS*, 72 F.3d 571, 588 (8th Cir. 1995) (noting that statutory rape is a crime of moral turpitude); *Castle*, 541 F.2d at 1066

(same); *Marciano*, 450 F.2d at 1024 (same). In fact, the sexual misconduct in question need not even involve a threat of physical contact. For example, we have held that merely communicating with a minor "for immoral purposes of a sexual nature" involves moral turpitude because "[s]exual communication with a minor is inherently wrong and contrary to the accepted rules of morality and the duties owed between persons." *Morales*, 478 F.3d at 978.

B

California's indecent exposure statute reads, in relevant part: "Every person who willfully and lewdly . . . [e]xposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby . . . is guilty of a misdemeanor." CAL. PEN. CODE § 314, subd. 1. The California Supreme Court has held that indecent exposure encompasses only conduct that "is sexually motivated" and thus requires "proof beyond a reasonable doubt that the actor not only meant to expose himself, but intended by his conduct to direct public attention to his genitals for purposes of sexual arousal, gratification, or affront." *In re Smith*, 497 P.2d 807, 810 (Cal. 1972); *see also People v. Archer*, 119 Cal. Rptr. 2d 783, 786 (Cal. Ct. App. 2002) (interpreting term "sexual" in *Smith* as modifying all three words that follow).

The California Supreme Court has applied § 314's requirement of "lewd" intent narrowly. In *Smith*, the defendant went to a public beach, removed all of his clothes, and fell asleep on a towel. 497 P.2d at 808. The police arrived several hours later and arrested the defendant; at this time, several other people were also present on the beach. *Id.* The *Smith* court concluded that the defendant's conduct did not violate § 314, reasoning that "[a]bsent additional conduct intentionally directing attention to his genitals for sexual purposes, a person, as here, who simply sunbathes in the nude on an isolated

beach does not 'lewdly' expose his private parts within the meaning of section 314." *Id.* at 810.

California courts have consistently applied § 314 only to conduct falling within the scope of the rule laid down in *Smith. See, e.g.*, *People v. Johnson*, 51 Cal. Rptr. 3d 893, 895 (Cal. Ct. App. 2006) (upholding conviction under § 314 of a prisoner who was observed by a female prison guard masturbating in his cell, "with the brightest cell lights turned on, while making eye contact with her")*; People v. Davey*, 34 Cal. Rptr. 3d 811, 812-13 (Cal. Ct. App. 2005) (upholding defendant's conviction under § 314 for exposing himself to multiple children simultaneously); *In re Michael H.*, 27 Cal. Rptr. 3d 627, 629 (Cal. Ct. App. 2005) (upholding conviction under § 314 of a juvenile who entered a neighbor's house, removed his clothes, and went into her bedroom where she was sleeping), *overruled on other grounds by In re Lemanuel C.*, 158 P.3d 148 (Cal. 2007); *People v. Noriega*, 22 Cal. Rptr. 3d 382, 383-84 (Cal. Ct. App. 2004) (upholding defendant's conviction under § 314 for exposing his genitals to several individuals, including children, on public transport); *People v. Britt*, 128 Cal. Rptr. 2d 290, 291-92, 295 (Cal. Ct. App. 2002) (upholding conviction under § 314 of man seen by minor children while he was masturbating outside their open window while looking inside); *Archer*, 119 Cal. Rptr. 2d at 785-86 (upholding conviction under § 314 of defendant who exposed his genitals and made an obscene comment to another driver in a road rage incident).

By contrast, California courts have reversed convictions under § 314 in cases either where there is no evidence that the defendant exposed his genitals or where there is no evidence that the offending conduct was accompanied by lewd intent. For example, in *People v. Massicot*, 118 Cal. Rptr. 2d 705 (Cal. Ct. App. 2002), the defendant had concealed his genitals but exposed other parts of his body, including his buttocks and thighs, by appearing in lace underpants and a lace bra. The Court of Appeal reversed the conviction, holding that the

statutory phrase "[e]xposes his person" applied only where the defendant displayed his or her entire unclothed body, including the genitals. *Id.* at 709-710. Similarly, in *In re Dallas W.*, 102 Cal. Rptr. 493 (Cal. Ct. App. 2000), the Court of Appeal held that a juvenile who had twice "moon[ed]" oncoming traffic could not be convicted under § 314 because there was no evidence that he had bared his buttocks in public with lewd intent. *Id.* at 494. The *Dallas* court also disapproved of the standard jury instructions used in that case because they permitted conviction on a finding that the defendant had acted with the intent to cause affront to others, even if that affront was non-sexual in nature. *Id.* at 494-95.

The majority agrees that "[u]nder § 314, it is the sexual intent with which the exposure occurs that transforms it into an act that is criminal, rather than an act that is merely improper or inappropriate." Maj. Op. at 2857. But for the majority, California's careful application of § 314 to only lewd conduct is not enough, and it obliquely argues that "sexual intent" or lewdness no longer qualifies as moral turpitude. Instead, the majority attempts to whittle down a crime of moral turpitude to conduct that necessarily involves "either actual infliction of harm or a protected class of victim; most often a combination of the two." Maj. Op. at 2854. Unless lewd conduct no longer qualifies as moral turpitude, California's indecent exposure statute categorically satisfies 8 U.S.C. § 1182's requirement of a "crime involving moral turpitude." Whatever the "fluid boundaries of our nebulous 'moral turpitude,' " indecent exposure bears no resemblance to "consensual sexual conduct among adults" and, as defined by California, is "conduct . . . offensive to at least a majority." Maj. Op. at 2855.

C

Notwithstanding the narrow scope the California courts have given § 314, the majority cites to three cases that it contends demonstrate that California "construe[s] 'sexual motiva-

tion' quite broadly" and punishes conduct that, in fact, does not involve moral turpitude.[1] Maj. Op. at 2857. The first case is a conviction for "nude dancing at bars." Maj. Op. at 2860. The remaining two are cases that, by the majority's lights, represent a "tasteless prank" or "de minimus provocation."[2] Maj. Op at 2862-65.

1

The principal case the majority uses to create a "realistic probability" that California will use § 314 to punish conduct that is not morally turpitudinous is a thirty year-old nude dancing case, *People v. Conway*, 162 Cal. Rptr. 877, 879 (Cal. App. Dep't Super. Ct. 1979). *Conway* was expressly disapproved by the California Supreme Court in 1982 in *Morris v. Mun. Court*, 652 P.2d 51, 58 n.13 (1982), and has not been cited since. There is no evidence whatsoever that *Conway* is good law or that California has any intention of using § 314 to try to punish mere nude dancing.

In *Conway*, the appellate division of the Los Angeles Superior Court upheld a municipal court conviction of a waitress and dancer in a beer bar who performed naked on a raised platform "display[ing] her private parts." *Conway*, 162 Cal. Rptr. at 878. The court reasoned that her specific intent to create sexual arousal in observers met the lewd and wilful requirements of § 314. *Id.* at 878-79. The majority argues that the dancing in *Conway* was not so "base, vile, or depraved"

---

[1]Although we have clearly held that "the Supreme Court squarely placed the burden on the alien to demonstrate a realistic probability that the state would apply the offense in a way that falls outside the generic definition of the crime," *Ortiz-Magana v. Mukasey*, 542 F.3d 653, 660 (9th Cir. 2008), the majority took the burden of proof upon itself. Ocegueda did not cite to any of the three California cases relied upon by the majority.

[2]The majority discusses *People v. Rylaarsdam*, 181 Cal. Rptr. 723 (Cal. Super. 1982), at some length, but concludes that it "need not rely on this case." Maj. Op. at 2859 n.7.

that it "shocks the conscience" and, therefore, a conviction under § 314 cannot be categorically a crime of moral turpitude. Maj. Op. at 2860-61.

*Conway* cannot establish a realistic probability that California would use § 314 to convict nude dancers in a nude entertainment venue of indecent exposure. There is no need to discuss whether mere nude dancing is so "base, vile, or depraved" that it "shocks the conscience." For purposes of this case, I am willing to assume that nude dancing in bars, without more, is not morally turpitudinous, although I am not sure that anything in the Supreme Court's jurisprudence compels that assumption. *See City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) (upholding, a municipal ordinance banning public nudity against a First Amendment challenge); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991); *City of Newport v. Iacobucci*, 479 U.S. 92 (1986) (per curiam); *New York State Liquor Auth. v. Bellanca*, 452 U.S. 714 (1981) (per curiam). Not only is *Conway* the only case since 1979 to use § 314 to uphold a conviction of a nude dancer, but *Conway* was decided when the law relating to nude dancing teetered back and forth from protected to unprotected expression under the First Amendment. *Conway* is even weaker precedent in showing a realistic probability that California will use § 314 to punish nude dancing because the law relating to nude dancing has changed dramatically since *Conway* was decided: *Conway* relied on a decision that has been overruled, and its reasoning is doubtful.

In 1968, the California Supreme Court overturned a conviction under § 314 for topless dancing at a nightclub. *In re Giannini,* 446 P.2d 535, 536-38 (1968). The court found that dance was a form of expression protected by the First Amendment, and thus the conviction for indecent exposure was unconstitutional. *Id.* Four years later, the California Court of Appeal upheld an injunction prohibiting owners of a bar from using the premises for lewdness in *People ex rel. Hicks v. Sarong Gals*, 103 Cal. Rptr. 414 (1972). The court noted that

there had been arrests at the bar under § 314, but found that the activities went well beyond nude dancing protected by the First Amendment under *In Re Giannini*. *Id.* at 417-418. Rather, these activities were "purely and simply obscene acts performed for the purpose of inciting the sexual desires and imaginations of a group of randy, beer-drinking patrons." *Id.* at 418. The Sarong Gals bar featured live entertainment involving naked females masturbating on stage, male customers masturbating while watching a naked dancer simulate sexual intercourse, naked females allowing customers to look into her innards and vigorously rubbing items in private areas. *Id.* at 417. Such activity is obscene by any standards, but in 1972, the court was clearly justified in finding such activity to be obscene and thus not protected as a form of expression. *See Miller v. California*, 413 U.S. 15, 24 (1973). It is clear that § 314 was used in this situation to arrest people for committing obscene acts and not as a way to convict nonobscene nude dancing.

A year after *Hicks*, the California Supreme Court overruled *In Re Giannini* in *Crownover v. Musick*, 509 P.2d 497 (1973). In *Crownover*, the court upheld city ordinances that prohibited the service of food or drink by "topless" women or "bottomless" persons of either sex and prohibited live acts by any such persons. *Id.* at 430-31. The court found both activities to be conduct, not speech, and concluded that regulation of these activities was justified by "considerations of public morals and general welfare." *Id.* at 427.

The Los Angeles Superior Court's decision in *Conway* was issued in 1979 when *Crownover* was still good law. In *Conway*, the court explicitly found that *Crownover* precluded the defendant's claim that her dancing was protected by the First Amendment. *Conway*, 162 Cal. Rptr. at 879-80 (stating that "defendant places her reliance on *In re Giannini*[,] and that case was overruled in *Crownover v. Musick*. . . . [W]e are bound by *Crownover* . . . ." (internal citations omitted)). Just three years after *Conway*, however, *Crownover* was overruled

by *Morris v. Municipal Court*, 652 P.2d 51 (1982). *Morris* established the current law for regulation of nude dancing in California. The court concluded:

> A ban on nude dancing cannot be sustained on the theory that it regulates only conduct and does not impinge upon protected speech. Nonobscene nude dancing cannot be barred without, in some cases, infringing upon constitutionally protected expression. [ ]An enactment prohibiting nonobscene nude dancing which extends beyond establishments serving alcohol is presumptively overbroad.

*Id.* at 564-65. In a footnote, *Morris* specifically disapproved *Conway* "to the extent it is inconsistent with the present opinion." *Id.* at 565 n.13. I cannot find any case after *Morris* where a court upholds a conviction for indecent exposure of a nude entertainer in a bar, and *Conway* has not been cited since by any court. There is, thus, no support whatsoever, except the majority's *ipse dixit*, that "*Conway* remains good law in relevant part." Maj. Op. at 2861 n.8. If anything in *Conway* survives, it is plainly not the majority's claim that "California courts [will], under § 314, uph[o]ld convictions for nude dancing at bars." Maj. Op. at 2860.[3]

Even if, as purely theoretical matter, there remains a sliver of unprotected, nude entertainment which is not so "base, vile, and depraved" that it "shocks the conscience" but neverthe-

---

[3]The majority argues that the Supreme Court's decisions in *Pap's* and *Barnes* have "significantly *strengthened Conway*'s conclusion that § 314 application to nude dancing does not violate the First Amendment." Maj. Op. at 2861 n.8. The majority's statement is true but irrelevant. Whether California may, consistent with the First Amendment, regulate nude dancing is utterly beside the point. The only thing we need to know is whether California uses § 314 to regulate nude dancing in bars. Aside from *Conway*, there is no evidence whatsoever for the majority's conclusion that "California courts have, under § 314, upheld convictions for nude dancing at bars." Maj. Op. at 2860.

less could be prosecuted under § 314 as indecent exposure, there is no indication that there is a "realistic probability" of conviction in the future. The statute requires that the exposure occur in a "public place, or in any place where there are present other persons to be offended or annoyed thereby." CAL. PEN. CODE § 314, subd. 1. It is unlikely that a conviction would stand for an individual who exposed herself or himself in an establishment devoted to nude dancing. Realistically, any person who attended a venue expecting nude entertainment would not be offended or annoyed by seeing the object of his or her presence.

More importantly, there is ample evidence that California and its municipalities tolerate nude dancing and do not regard it as violation of § 314. California regulates businesses that serve alcohol, including bars featuring nude dancers, but it does not do so through § 314. So far as I can determine from the published cases, in the past twenty years, no nude dancing or nude entertainment cases in California courts have even mentioned § 314. The majority of these cases deal with regulating alcohol licenses of commercial establishments that offer such entertainment, and a number of them show sensitivity to First Amendment questions surrounding nude dancing. *See SP Star Enter. v. City of Los Angeles*, 93 Cal. Rptr. 3d 152 (Cal. Ct. App. 2009) (holding that an adult nude entertainment club's argument that alcohol restrictions regulated speech lacked merit); *Krontz v. City of San Diego*, 39 Cal. Rptr. 3d 535 (Cal. Ct. App. 2006) (upholding city's suspension of a nude entertainment establishment's license when the establishment violated the rule that dancers must be six feet away from patrons); *Dep't of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.*, 121 Cal. Rptr. 2d 729 (Cal. Ct. App. 2002) (upholding suspension of a license because the nude entertainment club violated alcoholic beverage control regulations); *Wooten v. Superior Court*, 113 Cal. Rptr. 2d 195 (Cal. Ct. App. 2001) (setting aside an information charging two individuals for pimping and pandering where defendants hired women to perform sexual acts on each

other and not customers); *Tily B., Inc. V. City of Newport Beach*, 81 Cal. Rptr. 2d 6 (Cal. Ct. App. 1998) (holding that the city's ordinance prohibiting nude dancing and requiring pasties and g-strings during performances did not violate the First Amendment); *Smith v. County of Los Angeles*, 29 Cal. Rptr. 2d 680 (Cal. Ct. App. 1994) (holding that a city ordinance prohibiting nude dancing was too vague to survive constitutional scrutiny); *Thomas v. County of Los Angeles*, 283 Cal. Rptr. 815 (Cal. Ct. App. 1991) (same); *City of Rancho Cucamonga v. Warner Consulting Servs.*, 262 Cal. Rptr. 349 (Cal. Ct. App. 1989) (upholding regulations on nude dancing in places that serve alcohol); *Stroh v. Midway Restaurant Sys.*, 226 Cal. Rptr. 153 (Cal. Ct. App. 1986) (same). We too have dealt with some of the problems in the regulation of nude dancing establishments in California. *See United States v. Inzunza*, 580 F.3d 894 (9th Cir. 2009) (appeal by members of San Diego City Council convicted of accepting bribes to repeal the "no touch" ordinance for nude dancing). The reality is that no one in California seems to be concerned with nude dancing per se. Certainly, there is no evidence that in past 30 years anyone has been prosecuted under § 314 for nude dancing in bars.

The majority's proposed use of *Conway* strips the Supreme Court's limitation in *Duenas-Alvarez* of any real meaning. When the Supreme Court said a "realistic probability" it meant something more than dredging up a case from the Superior Court that was expressly disapproved 28 years ago by the California Supreme Court and has not been cited since.

2

The majority cites the last two cases as examples of California punishing a "tasteless prank" or "de minimus provocation." Maj. Op. at 2862-65. The first case, *People v. Archer*, 119 Cal. Rptr. 2d 783 (Cal. Ct. App. 2002), involved a male driver who exposed his genitals to a female driver and then yelled a sexually explicit comment to her in a road rage inci-

dent. The majority dismisses the incident as "crass" and involving only "transitory nudity." Maj. Op. at 2863-65. That characterization is quite unfair to the California courts. Archer appealed his conviction for indecent exposure on the grounds that there was no evidence that he acted with "lewd" intent. Beginning from the premise that " 'lewd' is an essential element of the offense," the Court of Appeal found there was sufficient evidence to uphold his conviction. 119 Cal. Rptr. 2d at 785 (quoting *In re Smith*, 497 P.2d at 810). The court worked carefully through the California Supreme Court's seminal decision on § 314, *In re Smith*, and the then-recent decision of the Court of Appeal dismissing a conviction under § 314 for mooning, *In re Dallas W.*, 102 Cal. Rptr. 2d 493 (Cal. Ct. App. 2000). In *In re Smith*, the California Supreme Court held that "lewd" intent meant that the accused "direct[ed] public attention to this genitals for purposes of sexual arousal, gratification, or affront." 497 P.2d at 810. The *Dallas* court had held that the adjective "sexual" modified all three of the terms that followed "arousal, gratification, and affront." *In re Dallas*, 102 Cal. Rptr. 2d at 494. The *Dallas* court had found that "Dallas acted only to annoy and affront people and *not* with 'sexual intent in the sense that he intended to arouse himself or a third person by his act' . . . . Dallas did not violate section 314 [by mooning traffic]." *Id.* at 495 (emphasis in original). Archer claimed that he too merely intended to offend or annoy his victim by exposing his penis to a female driver. The Court of Appeal rejected this argument because "it is enough if the defendant exposed himself for purposes of 'sexual affront.' " *Archer*, 119 Cal. Rptr. 2d at 786-87. Accordingly, "a defendant who intentionally exposes 'his person, or the private parts thereof' to another for the purpose of *sexually* insulting or offending the other person commits indecent exposure in violation of section 314." *Id.* at 787. The court concluded that "[Archer's] act of exposing his penis . . . accompanied by the comment 'suck [my] dick' " was sufficient evidence to support his conviction under § 314. *Id.*

The majority also points to an unpublished opinion of the

Court of Appeal, *People v. Lionel M.*, 2007 WL 2924052 (Cal. Ct. App. Oct. 9, 2007).[4] In *Lionel,* a twelve year-old boy called "hey, look" to two twelve-year old girls in his class. Lionel had pulled his pants down and exposed his penis. Lionel appealed his conviction under § 314 on the grounds that he did not have "lewd" intent. The Court of Appeal reviewed *In re Smith*, *In re Dallas*, and *Archer.* The court stated that merely exposing his genitals would not have been sufficient to convict Lionel under § 314. It found that "this case includes additional facts suggesting a lewd intent:

> [Lionel] approached the two girls, gained their attention, and then exposed his penis. The exposure of his genitalia was not, as in *Smith*, a consequence of passive nudity, but a deliberate action directed at two young girls. . . . [Lionel] did not, for example step to the front of the room to briefly flash the entire class or streak through the school halls; instead he targeted Devyn and Marlena and ensured they observed his private parts from a close distance . . . . [Lionel's] choice to highlight only his penis provides adequate evidence of the sexual nature of the offense.

> Although the circumstances surrounding [Lionel's] action are subject to other reasonable interpretations, we find sufficient support for the trial court's

---

[4]According to Cal. R. Ct. 8.1115, "an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action." The only exceptions are for when the opinion is relevant to a res judicata, collateral estoppel, or criminal or disciplinary action stating reasons for a decision affecting the same defendant. I question whether the majority should rely on this unpublished opinion.

We have long had a rule against citation of our own unpublished dispositions, 9th Cir. R. 36-3, for reasons that have been well explained. *See* Alex Kozinski & Stephen Reinhardt, *Please Don't Cite This!*, CAL. LAWYER 43 (June 2000).

> implied finding that appellant acted with the purpose
> of a sexual affront.

*Id.* at *2-*3.

Based on its own reading of these cases, the majority finds that these incidents were not "highly threatening, intrusive, [or] psychologically damaging" to the victims but were "mere acts of provocation, bad taste, and failed humor." Maj. Op. at 2865. The majority's conclusion is way beyond any evidence in the cases or the record before us. In fact, the California courts have rejected the claim that § 314 reaches "mere acts of provocation, bad taste, and failed humor." As the California Court of Appeal said in *In re Dallas W.* (the "mooning" case), "Dallas may have been guilty of some other offense, and he certainly exhibited bad judgment and poor taste—but the trial court's findings make it clear that Dallas did not violate *section 314.*" 102 Cal Rptr. 2d at 495 (citation omitted; emphasis in original).

The majority's characterization of *Archer* and *In re Lionel M.* is one of two things. Either it is a collateral attack on the judgments because the majority simply doesn't believe the evidence or, even worse, it is a determination that lewd conduct is categorically no longer a crime of moral turpitude. If it is a collateral attack, it is sorely misplaced. We have no competence in this proceeding to question the findings of the California courts, and the fact that judges on our court might have taken a different view on direct review of those cases is of no moment. The California courts found that Archer and Lionel deliberately engaged in lewd conduct in a public place and that is a "crime involving moral turpitude."

If, however, the majority means to remove lewd conduct from the category of crimes involving moral turpitude, its discussion is a wholesale assault on sex crimes as crimes involving moral turpitude. As our cases demonstrate, it is too late for the majority to take that position, but one reads the major-

ity opinion wondering how any sex crimes will satisfy its standards.

### III

Our morality is not the measure of "accepted moral standards." *Rodriguez-Herrera*, 52 F.3d at 240. California is in a far better position to determine those moral standards. Whatever inclination California might once have had to regulate nude dancing, it is clear that one may now dance nude in bars with aplomb. But California continues to draw a line against those who expose their genitals in public when they do so "lewdly," meaning "for purposes of sexual arousal, gratification, or affront." *In re Smith*, 497 P.2d at 810. That members of our court might have taken a different view of the evidence in a state case does not change that fact. It certainly does not satisfy Ocegueda's burden of showing "a realistic probability, not a theoretical possibility, that [California] would apply its [indecent exposure] statute to conduct that falls outside the generic definition of a crime [involving moral turpitude]." *Duenas-Alvarez*, 549 U.S. at 193.

I would deny the petition. I respectfully dissent.